IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| CLARENCE E. FYOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:15-cv-05012-NKL |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Plaintiff Clarence E. Fyock appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits. The decision is affirmed.

**I.  Background**

Fyock was born in 1962. On August 5, 2011, an ALJ denied Fyock's previous application for benefits. Nothing in the record shows that denial was ever set aside on appeal.

With respect to the application now at issue, Fyock alleges disability based on knee injuries, gastroesophageal reflux, and obesity. He initially claimed an onset date of August 6, 2011, but subsequently amended it to August 15, 2012. The ALJ held a hearing on August 23, 2012, and denied the application on September 25, 2013. The Appeals Council denied Fyock's request for review.

**A.  Medical history**

On September 13, 2011, Fyock saw Thomas Hopkins, M.D., for bilateral knee pain that worsened when he walked distances; acid reflux; abdominal pain; and elbow pain. Fyock reported he had pain regardless of activities. He weighed 331 pounds and his blood pressure was 170/96. Dr. Hopkins noted that it was difficult to examine Fyock due to his size, but observed

Fyock had crepitus in his knee. The doctor's assessment was hypertension, morbid obesity, bilateral knee pain, and GERD, and the plan included discussion of weight loss, naproxen (Aleve), and ranitidine (Zantac). Fyock was to return to the clinic in two to three weeks.

On January 6, 2012, Fyock told Dr. Hopkins that money issues prevented him from returning to the clinic sooner. Fyock stated that the ranitidine helped with his GERD, and that his right knee had given way the day before, causing him to fall. Dr. Hopkins did not note any physical abnormalities other than an issue with Fyock's right eye. Dr. Hopkins noted Fyock could not afford his medication. The diagnoses remained the same and Dr. Hopkins indicated Fyock was not an appropriate candidate for knee surgery.

On June 8, 2012, Fyock complained of intermittent pain and swelling in his feet. Dr. Hopkins prescribed generic blood pressure medication, continued ranitidine, and advised Fyock to return to the clinic in one month.

Fyock returned to see Dr. Hopkins on August 31, 2012, to follow up on his blood pressure. Fyock reported a previous blood pressure reading of 154/104 with headache, dizziness, and tightness in his chest. He denied vision changes and shortness of breath. Dr. Hopkins ordered labs and instructed Fyock to return to the clinic in one month or sooner if his symptoms worsened. Fyock complained of a rash but did not complain of knee pain, and the physical exam findings do not mention Fyock's knees.

Fyock returned to Dr. Hopkins a year later on June 14, 2013, for medication refills. The doctor's assessment was hypertension. The general examination notes indicate Fyock was in no acute distress; that there was no clubbing, cyanosis or edema of the extremities; and that he had normal strength in the extremities. The doctor renewed Fyock's Lisinopril, for cholesterol, and ranitidine, for GERD.

On August 14, 2013, Fyock saw Adina Sanchez, APRN, telling her he was requesting

disability due to his right leg "locking up" and requesting that she prepare disability paperwork. [Tr. 262.] Fyock also reported long-standing dysphagia and hypertension. Fyock reported knee pain, but physical examination showed no abnormalities. The nurse declined to complete Fyock's disability paperwork because he was a new patient and suggested he see the provider he had been seeing the past couple of years. Fyock "report[ed] past provider declines to complete paperwork." [Tr. 263.]

### B. Opinion evidence

A consultative examiner, William S. Hughes, D.O., provided an opinion in connection with Fyock's prior disability application. Dr. Hughes' physical exam showed, among other things, that Fyock had no lower extremity muscle weakness, could walk heel to toe, had normal gait, had no significant sensory or reflexive abnormalities, and did not need an assistive device for ambulation. Dr. Hughes opined, "There are no real significant issues with sensory, motor or reflexive abnormalities noted. Certainly, this patient probably will have to have a sedentary type job. Prolonged standing or walking might aggravate his knees. Lifting would also possibly aggravate his knees." [Tr. 248.] The ALJ did not mention Dr. Hughes' opinion in the decision.

Dr. Hopkins filled out a 2-page Residual Functional Capacity Questionnaire on January 6, 2012. The doctor listed diagnoses of morbid obesity, osteoarthritis in both knees, and hypertension, and stated Fyock's prognosis was poor if he was unable to receive financial assistance to pay for medications, testing, and doctor visits. Dr. Hopkins listed dyspnea (labored breathing) with exertion and knee pain as additional symptoms. The doctor opined that Fyock's symptoms frequently interfered with attention and concentration required to perform simple, work-related tasks. In response to the question, "Would your patient need to recline or lie down during a hypothetical 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon?," the doctor checked,

3

"No." [Tr. 249.]

In the area of the form addressing functional limitations, Dr. Hopkins indicated Fyock could walk one block, stand or walk for 15 minutes at one time, and stand or walk for a total of two hours in an 8-hour workday. Dr. Hopkins checked boxes indicating Fyock needed work that permitted him to shift positions at will from sitting, standing, or walking, and that he would need to take unscheduled breaks. He wrote that Fyock would need to take breaks of "15 minutes," "every 15 minutes" during the workday. [Tr. 249.]

Dr. Hopkins noted Fyock could lift up to 20 pounds occasionally and should never lift 50 pounds. He indicated Fyock had no limitations with respect to repetitive reaching, handling, or fingering, and would be absent from work once or twice per month due to his impairments or treatments. Finally, Dr. Hopkins checked boxes indicating Fyock was not a malingerer, and that his impairments were reasonably consistent with his symptoms and functional limitations. The ALJ gave Dr. Hopkins' opinion little weight.

A vocational expert opined concerning the abilities of an individual of Fyock's age, education, and experience, who was able to perform light work except that he would not be able to climb ladders, ropes, or scaffolds, and could climb ramps and stairs only occasionally; could do no kneeling or crawling; and was limited to simple work consisting of routine, repetitive tasks involving no strict production quotas, where the emphasis was on a per-shift, rather than a per-hour basis. The expert opined that such an individual could perform Fyock's past work of hand packager and warehouse worker as Fyock had performed them. [Tr. 44.]

C. **Fyock's adult function report and hearing testimony**

According to Fyock's Adult Function report, dated October 26, 2011[1], lived with his mother and took his dogs for walks twice a day. [Tr. 167-174.] He stated that he could walk one

---

[1] Although the answers written on Fyock's form are primarily in the first person, Rosemary Rice, Fyock's mother, signed the form. [Tr. 174.]

4

block, rest, and then walk back home. He stated that it previously took him 30 minutes to mow the lawn, but now took two hours. [Tr. 168.] Fyock had no issues with personal care and grooming, and prepared all kinds of food, sometimes with his mother's help. Fyock helped clean the house and went grocery shopping with his mother. His ability to handle money had not changed, but he had to read books twice in order to understand them. He attended church weekly. In the area of the form for indicating how the disabled person's illness, injury, or conditions affect postural and functional limitations such as lifting, bending, walking, sitting, stair climbing, concentration, and following instructions, Fyock neither checked nor described any limitations. [Tr. 172.]

At the September 2013 hearing, Fyock stated that he was about six feet tall and weighed "about three something." [Tr. 35.] He testified he had problems with his knees, but was not taking any medication. He said the pain was constant in his right knee and intermittent in the left. Fyock stated he could walk about a block before having problems with his knees, and he could sit for about 30 minutes before needing to stand and walk around, and he could stand for about 15 minutes. He said he could climb no more than three stairs. Fyock testified that he took over-the-counter medication, Aleve, for knee pain which he said helped a little but not much. When his pain got bad, he used a thermal treatment called Blue Ice. He testified that he did not take prescribed pain medication for his knee because he could not afford it.

Fyock testified that he experienced swelling in his feet in addition to the knee pain, and he had to elevate his feet for up to an hour. If he elevated his feet longer than that, he said his knees would begin to hurt. Fyock also testified that he could watch television for approximately half an hour before having to get up and start walking around.

Fyock lived with his mother and helped her with dishes and cleaning. He testified he could help his mother around the house for 15 to 20 minutes before having to take a break. He

5

also cooked simple meals. He handled his own dressing and bathing. He did not have a driver license. On a normal day, Fyock took about half an hour to get ready in the morning and then took his dogs on a walk down the road. When asked by his attorney about the distance he walked with the dogs, Fyock stated that he walked a block with them and could not "make it" back due to pain. [Tr. 41.] After returning from the dog walk, Fyock rested before helping his mother around the house. Fyock testified that he liked to watch home improvement shows so he would know what to do if something went wrong with the house. He stated that he awoke three to four times per night because his legs hurt.

Fyock took medication for his acid reflux and high blood pressure, but testified that he could not afford an inhaler to treat his asthma.

Until 2007, when his employer closed the plant where he worked, Fyock was a packager and drove a forklift "a little bit." [Tr. 35-36.] He has not worked since then.

### D. The ALJ's decision

The ALJ found that during the relevant period, Fyock had severe impairments of degenerative joint disease of the knees, gastroesophageal reflux disease, and obesity. Fyock did not claim to meet any Listings, and the ALJ did not find that he met any.

The ALJ found Fyock has the residual functional capacity to perform:

> [L]light work as defined in 20 CFR 416.967(b) except he should perform no climbing of ladders, ropes or scaffolds; only occasional climbing of ramps and stairs; and no kneeling or crawling. Furthermore, the claimant is limited to simple work (specific vocational preparation of one or two as defined by the Dictionary of Occupational Titles), consisting of routine, repetitive tasks and involving no strict production quotas, where the emphasis is on a per-shift, rather than per-hour basis.

[Tr. 20.] The ALJ found Fyock's allegations of totally disabling, medically determinable impairments not entirely credible. The ALJ further determined Fyock is capable of performing past relevant work as a hand packager.

6

## II. Discussion

Fyock argues that the ALJ's credibility finding is unsupported by substantial evidence; the ALJ failed to afford appropriate weight to the opinions of treating physician Dr. Hopkins, and consultative examiner Dr. Hughes; and that the RFC is not supported by substantial evidence.

The Commissioner's findings are reversed "only if they are not supported by substantial evidence or result from an error of law." *Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the Commissioner's conclusions. *See Juszczyk v. Astrue,* 542 F.3d 626, 631 (8th Cir. 2008). "If substantial evidence supports the Commissioner's conclusions,. [the Court] does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915.

### A. The credibility finding

Credibility is "primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009) (internal quotation and citation omitted). When an ALJ determines a claimant is not credible and decides to reject the claimant's statement, the ALJ must provide specific reasons for the finding. *See Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991); *Prince v. Bowen*, 894 F.2d 283, 296 (8th Cir. 1990). The ALJ must consider evidence related to the claimant's work record; daily activities; "the duration, frequency and intensity of pain; the precipitating and aggravating factors; the dosage and side effects of medication; and functional restrictions." *Delrosa*, 922 F.2d at 485 (citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984)); *see also* 20 C.F.R. 404.1529 and 416.929 (codifying the *Polaski* factors). An ALJ may discount a claimant's complaints if they are inconsistent with the record as a whole. *Wildman v. Astrue,* 596 F.3d 959, 968 (8th Cir. 2010). A reviewing court normally defers to an ALJ's credibility

finding if the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010) (citation omitted), and when substantial evidence on the record as a whole supports the credibility finding, *Peña v. Chater,* 76 F.3d 906, 908 (8th Cir. 1996).

The ALJ expressly acknowledged and applied the *Polaski* factors. The ALJ noted Fyock had a "very limited" treatment history and had been to the doctor only a "handful" of times. [Tr. 22.] The medical record shows only six visits with treatment providers, and only three of those visits were after Fyock's amended disability onset date of August 15, 2012. Fyock's August 31, 2012 visit with Dr. Hopkins was a blood pressure follow-up. At that visit, Fyock complained of a rash but did not complain of knee pain, and the doctor made no findings on physical exam with respect to Fyock's knees. Fyock next saw Dr. Hopkins one year later, in June 2013, for medication refills. The general examination notes indicate Fyock was in no acute distress; there was no clubbing, cyanosis or edema of the extremities; and Fyock had normal strength in the extremities. The doctor's assessment was hypertension. The doctor renewed Fyock's Lisinopril, for cholesterol, and ranitidine, for GERD. The August 2013 visit with Nurse Sanchez appeared to have been for the purpose of obtaining an opinion for his disability application. The nurse found no abnormalities of Fyock's knees on physical exam. The nurse declined to complete Fyock's disability paperwork because he was a new patient and suggested he see the provider he had been seeing the past couple of years. But Fyock "report[ed] past provider declines to complete paperwork." [Tr. 263.] Presumably, had Fyock's impairments been as limiting as he alleged, he would have sought care more frequently, or sought other care options. His failure to do so weighs against his credibility. *See Edwards v. Barnhart*, 314 F.3d 964, 967-68 (8th Cir. 2003) ("It was within the province of the ALJ to discount Edwards's claims of disabling pain in view of her failure to seek ameliorative treatment.").

8

Case 3:15-cv-05012-NKL   Document 15   Filed 10/02/15   Page 8 of 14

The ALJ went on to note that Fyock's daily activities were inconsistent with his allegations. [Tr. 22-23.] He was capable of a range of activities, including walking and caring for dogs, mowing the lawn, cooking, cleaning, and grocery shopping. He liked to watch home improvement shows to learn how to make repairs around the house. He also handled all his grooming and personal care needs. Such daily activities support the ALJ's decision that Fyock's allegations were not fully credible. *McDade v. Astrue*, 720 F.3d 994, 998 (8th Cir. 2013) (ALJ properly relied on daily activities that were not unduly restricted).

The ALJ also found that Fyock's use of only over-the-counter medication weighed against his credibility. [Tr. 23.] Instead of pain management, his doctor focused on treating Fyock's high blood pressure and GERD. When Dr. Hopkins did recommend medication for Fyock's complaints of knee pain, prior to the August 2012 alleged amended onset date, the doctor never prescribed anything but over-the-counter medication, Aleve. Failure to require prescription pain medication belies allegations of debilitating pain. *Bentley v. Shalala,* 52 F.3d 784, 786 (8th Cir. 1995) ("The absence of prescription medicine and the failure to seek medical treatment for such a long time during a claimed period of disability tends to indicate tolerable pain."). Furthermore, Dr. Hopkins did not recommend more aggressive treatment or additional testing, and noted Fyock was not a candidate for knee surgery. Conservative treatment also weighs against the credibility of Fyock's subjective allegations. *Milam v. Colvin,* 794 F.3d 978, 985 (8th Cir. 2015) (relatively conservative course of treatment including exercises and medication contradicted the claimant's subjective complaints of disabling conditions).

Fyock's sporadic work history also played a role in the ALJ's determination. Fyock had not worked since 2007 and testified that he stopped because the plant where he worked closed. "A lack of work history may indicate a lack of motivation to work rather than a lack of ability." *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001); *see also Fredrickson v. Barnhart*,

359 F.3d 972, 976 (8th Cir. 2004) (claimant not credible due in part to a sporadic work record and low or no earnings).

Fyock argues that the ALJ should have considered Fyock's financial limitations. As discussed above, Dr. Hopkins only ever prescribed an over-the-counter pain medication, and even then, only prescribed it prior to the date of Fyock's alleged onset date. Dr. Hopkins did not recommend a stronger, prescription pain medication, nor any testing or treatment, let alone any that Fyock would have had to pay for. If Fyock's level of impairment were as significant as he claimed, he could have sought more significant treatment from Dr. Hopkins, or a second opinion. Fyock in fact was able to see another provider, Nurse Sanchez, for purposes of preparing his application for disability benefits. There is no evidence in the record that Fyock's finances limited his access to care, nor even any indication that he sought financial assistance. *See Clark v. Shalala*, 28 F.3d 828, 831 n.4 (8th Cir. 1994) (claimant offered no testimony or other evidence that she had been denied further treatment or access to prescription pain medicine on account of financial constraints). Therefore, Fyock's argument about financial limitations does not alter the analysis.

Substantial evidence on the whole record supports the ALJ's credibility determination and it will not be disturbed.

### B. Weight given the opinion evidence

Fyock argues that the ALJ did not properly weigh the opinions of his treating physician and a consultative examiner.

The amount of weight given a treating medical source opinion depends upon support for the opinion found in the record; its consistency with the record; and whether it rests upon conclusory statements. An ALJ must give controlling weight to a treating medical source opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic

10

techniques, and is not inconsistent with the other substantial evidence. *Papesh v. Colvin,* 786 F.3d 1126, 1132 (8th Cir. 2015) (*quoting Wagner v. Astrue,* 499 F.3d 842, 848-49 (8th Cir. 2007)). The opinion may be given "limited weight if it provides conclusory statements only, or is inconsistent with the record." *Id*. (citations omitted). But the ALJ "may discount or even disregard the opinion . . . where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* (*quoting Miller v. Colvin*, 784 F. 3d 472, 477 (8th Cir. 2015)).

Fyock argues that the ALJ should have given controlling weight to Dr. Hopkins' January 6, 2012, opinion because he was Fyock's treating physician. While there are certainly circumstances in which a treating physician's opinion is entitled to such weight, none are present here. First, as the ALJ noted, the opinion was rendered before Fyock's alleged onset date and, therefore, did not address his functional limitations during the relevant period. Nevertheless, the ALJ considered Dr. Hopkins' opinion as though it had been rendered at the relevant time and still found it wanting. At the time, Dr. Hopkins had had only a limited treatment relationship with Fyock, having completed the form after only two visits. *See* 20 C.F.R. § 416.927(c)(2)-(4) (listing length of treating relationship, supportability and consistency as factors in weighing opinions).

Furthermore, there is no mention in the treatment notes of those two visits that would support any of Dr. Hopkins' extreme conclusions, including that Fyock could walk only one block and could sit, stand, or walk for only 15 to 20 minutes at a time. At the January visit, Fyock reported having fallen due to his knee, but there are no medical findings noted. Overall, Fyock's records contain scant findings of physical abnormalities. Dr. Hopkins never indicates in the treatment records that Fyock is incapable of or must refrain from physical activities. In short,

11

Dr. Hopkins' opinion is conclusory, and unsupported and inconsistent with treatment notes. *See id.; Brown v. Chater*, 87 F.3d 963, 964-65 (8th Cir. 1996) (conclusory statement of disability based on plaintiff's subjective complaints of pain are entitled to little weight when unsupported by objective medical evidence).

Fyock also argues that the ALJ failed to consider a 2010 opinion prepared by a consultative examiner, Dr. Hughes, in conjunction with Fyock's prior application for benefits which was denied. Even if Dr. Hughes' opinion is considered here, it does not alter the analysis in Fyock's favor. Dr. Hughes' physical exam showed, among other things, that Fyock had no lower extremity muscle weakness, could walk heel to toe, had normal gait, had no significant sensory or reflexive abnormalities, and did not need an assistive device for ambulation. Dr. Hughes opined, "There are no real significant issues with sensory, motor or reflexive abnormalities noted. Certainly, this patient probably will have to have a sedentary type job. Prolonged standing or walking might aggravate his knees. Lifting would also possibly aggravate his knees." [Tr. 248.] An opinion that Fyock would "probably" have to have a sedentary job, and that prolonged standing or walking "might" aggravate his knees is hardly a limitation on his ability to perform a range of light work, particularly in view of Dr. Hughes' opinion that Fyock had no real, significant issues with sensory, motor or reflexive abnormalities. The opinion is also at odds with Fyock's daily activities, described above. Furthermore, an opinion about a claimant's ability to perform work invades the Commissioner's province. *See House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination."). Dr. Hughes' opinion is not substantial evidence demonstrating Fyock was, or is, limited to sedentary work. Fyock was not prejudiced by the ALJ's failure to consider it. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir.

2007) (citations omitted) (reversal is necessary only if the failure prejudices the claimant); *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir. 1992) (an arguable deficiency in opinion writing technique is not grounds for reversal when that deficiency had no bearing on the outcome).

The ALJ's assessment of the weight to be given the opinion evidence is supported by substantial evidence.

### C. Formulation of the RFC

Finally, Fyock argues that the RFC is not based on substantial evidence. Residual functional capacity is what a claimant can still do despite physical or mental limitations, and should take into account the effects of treatment a claimant receives, including frequency and disruption to routine. 20 C.F.R. § 404.1545(a); *Masters v. Barnhart,* 363 F.3d 731, 737 (8th Cir. 2004); Social Security Ruling 96-8p, 1996 WL 374184, *5 (July 2, 1996). A claimant has the burden to prove his or her RFC at step four of the sequential evaluation. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Thus, an ALJ's failure to include certain limitations does not require reversal if there is no evidence that the "conditions impose any restrictions on [the claimant's] functional capabilities." *Owen v. Astrue,* 551 F.3d 792, 801 (8th Cir. 2008).

Here, the ALJ first determined Fyock could perform a range of light work as defined in 20 C.F.R. 416.967(b), which includes frequent lifting of 10 pounds and occasional lifting of 20 pounds. The ALJ also concluded Fyock should not climb ladders, ropes or scaffolds and should not kneel or crawl. These limitations, which prevent Fyock from climbing on unstable, unsupported surfaces, account for the degenerative joints in his knees and mobility issues associated with his obesity. Finding that Fyock was limited to occasional climbing of ramps and stairs also accounts for these impairments. Additionally, Fyock testified that his knees began to hurt if he climbed more than three stairs, which further supports this limitation. Finally, the ALJ

found Fyock was limited to simple work that consisted of routine, repetitive tasks that did not involve strict production quotas in order to account for a slowed work pace due to pain.

After determining Fyock's RFC, the ALJ compared it to his past relevant work to determine whether he can return to it either as performed in the past or as generally performed in the national economy. *See* 20 C.F.R. § 416.920(f). When asked a hypothetical question which set forth Fyock's limitations in a manner consistent with the ALJ's findings concerning Fyock's condition and functional limitations, the vocational expert testified that Fyock could perform his past work of hand packager and warehouse worker. This testimony constitutes substantial evidence to support the ALJ's decision that Fyock could perform past relevant work. Thus, the ALJ properly found that Fyock was not disabled.

Relying on Dr. Hughes' opinion from the prior case, Fyock claims that the RFC is in error because Fyock should be limited to sedentary work which would, consequently, trigger the grid rule and, due to his age of 50 years, necessarily render him disabled. *See* 20 C.F.R., Pt. 404, Subpt. P. App. 2 § 202.12. As discussed above, Dr. Hughes' opinion does not constitute substantial evidence demonstrating Fyock is limited to sedentary work, whether at the time the opinion was prepared, or presently.

## III.   Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated:  October 2, 2015  
Jefferson City, Missouri